The Honorable, the United States Court of Appeals for the First Circuit is now in session. All persons having any business before this Honorable Court may give their attendance and they shall be heard. God save the United States of America and this Honorable Court. Court is in session. Today's case will be called as previously announced and the times will be as allotted to counsel. The case today is United States v. Neha Moore-Bush, Appeal No. 19-1582. United States v. Daphne Moore, Appeal No. 19-1583. United States v. Neha Moore-Bush, Appeal No. 19-1625. And United States v. Daphne Moore, Appeal No. 19-1626. Attorney Crum, please introduce yourself for the record and proceed with your argument. Good morning. May it please the court, Randall Crum on behalf of the government. Chief Judge Howard, may I reserve four minutes for rebuttal? Yes. Thank you. The use of a video surveillance camera in this case as part of a criminal investigation was constitutional because it's comported with the long settled view that a person does not have a reasonable expectation of privacy in activities that are knowingly exposed to the public. The camera was set up on a pole camera across from the defendant's house because there was a belief that illegal gun sales and drug dealing was occurring at the house and it viewed only the front of the house and the driveway, areas that were visible from a public street. It did not see into the house. Those reasons it was constitutional under settled Fourth Amendment precedent. The district court held that that was not the case because it believed that the Supreme Court's decision in United States v. Carpenter addressed drastically, it's not entirely repudiated the idea that publicly exposed activities are not subject to Fourth Amendment protections. But I don't think that the Carpenter case can possibly be read quite so broadly for two primary reasons. First, the case itself is self-described as extremely narrow, addressing rare circumstances and includes the limitation stating that it does not intend to upset traditional surveillance techniques, including security cameras. But more importantly and fundamentally, it simply had no reason to and did not address the pivotal issues here or the precedents that are relevant here, which have to do with their surveillance using visual means of activities that are performed in public view. That issue in Carpenter was cell phone information, location information generated as a byproduct of using a cell phone that's automatically collected by cell phone companies and retained by those companies. The question was whether that information could be acquired by the government without a warrant under the so-called third party doctrine that allows for the government to obtain under certain circumstances information in the hands of third parties. But this is not a case involving the application of third party doctrine, nor is it a case involving the acquisition of electronically generated location information as was the case there. And that's significant because the question of knowing exposure plays very differently in the circumstances of a case like Carpenter than it does in a case like this. Counselor, your definition of knowingly exposing oneself to the public, therefore means that whenever one ventures outside of the home, you're knowingly exposing yourself. So your only option to not knowingly expose yourself to the public is to do what we've been doing during the pandemic, which is staying inside. Well, I think the question isn't necessarily what one must do, but what nature of what privacy means. And that's why the language that Katz used is so important. It distinguishes knowingly exposed information from information that is kept private. And as a matter of semantics, the words private and public are antonyms. In the thesaurus, each one is the negative of the other. And when Katz says that what we're concerned with is expectations of privacy, but not with public acts, it's drawing distinction about what it means for a person to act in a public way, to expose activity to the public. And it's saying that sort of definitionally, that's not the same as expecting it to be or reasonably expecting it to be private. So, you know, each of us does undertake actions in places that are presumptively private, our home and in places that are public. And that line is drawn, I think, clearly in Katz itself, that those two are sort of opposite poles. And that's why the Supreme Court has said you can have a reasonable expectation of privacy beyond the boundaries of your home. And so I guess the first part of the subjective inquiry is what is a person's reasonable expectation of privacy in stepping outside of their home? Is it so broad as to say that there's none? Well, I think it's a question of, again, whether it's the way they define it in Katz is whether it's been knowingly exposed. And I think what Katz says, and the example that Justice Harlan uses in his concurrence is if you go outside and have a conversation, you are running the risk or you are not manifesting an intent to keep it private. You're doing it in a place where it could be overheard. And the same would be true of something you do visibly in public. And I think that is where the line is drawn. It doesn't mean there aren't circumstances where you could keep something private. Katz describes one. How do you reconcile that with Carpenter? The position you're taking right now, given that obviously the person in Carpenter ventured outside the home, was in public, and yet was thought to have a reasonable expectation in the whole of their movements, which were conducted in public. That's true. And the way the court described it was that what it was talking about was a reasonable expectation of privacy in the whole of their movements as captured by these electronic means. And that it's important to know that in that case, the information that government... Mr. Cohen, that's not how I read it. It says first that they had a reasonable expectation of privacy in the whole of their movements. And then it says that expectation was contravened by the accessing of the cell site location. So the first step they make is to say that there could be a reasonable expectation of privacy in the whole of their movement. Are you saying that's wrong? Well, as I recall, Carpenter just says it twice, and once it ties it specifically to the whole of their movements as captured by CSLI, and one time it says it more broadly. But is your position that you cannot have a reasonable expectation of privacy in the whole of your movement? I would say that in Jones, I think the distinction... I don't think Carpenter makes that entirely clear, but I would say that the best evidence we have is the majority opinion in Jones. And what Jones said was there was a recognition that the concurrence had found a reasonable expectation of privacy in the electronic information, that the electronic collection of GPS data would violate. But the majority opinion stated that four weeks of observational surveillance using cars and aerial surveillance would in fact be permissible under the court's precedent. I think that's the clearest indication we have. It may be that Carpenter went further. If I read Carpenter to think that there was a reasonable... the whole of your movements in public, notwithstanding that they'd be exposed to public view, and then we would have the question of what types of surveillance of those movements contravened that expectation. Obviously, a passing person in the street saying you do those movements wouldn't, but maybe cell site, we know from Carpenter, accessing cell site would. If I thought that was the proper reading of Carpenter, why would there not be similarly a potential for a reasonable expectation of privacy in the whole of the movements that occur within the curtilage of your house? Well, I think for the simple reason, which is that they're a much smaller slice of those movements. The right to privacy that the court recognized, and again, I think it can be debated as whether it applied to visuals observation of those very same activities, because Jones suggests perhaps it didn't. But if that's not the correct reading, it was very clear that it was the entirety, the whole of the movements and the whole of the movements of the particular person in question. What is being observed through this poll camera is a very small slice of the movements and activities, which include only those occurring in the front of one's house. Now, obviously it says nothing about where one goes, whether where one goes to worship, where one shops, or whether one goes to a political demonstration, the kinds of concerns reflected in Jones and incorporated in Carpenter about what it shows about a person to show everywhere they go. It shows, for the most part, simply when they're there, when they're not, and a bit about who comes there. And so I think it's a much smaller slice. It shows over an eight-month period who's visiting you. I mean, that was the purpose of putting it there. They wanted to know who was visiting to buy the guns, right? Certainly. I mean, it certainly captured associations. I mean, I think the difficulty with relying on that by itself is that virtually every surveillance method, including pen registers and many that have been approved, show associations. And they're used over time because that's what they're supposed to do. They're trying to find out the associations of somebody they suspect of involvement in criminal activity. Is there any limiting principle? Is there any limiting principle, or could the poll camera have been there for five years and that would be okay? Well, I don't think in the examples, the information that we have right now, the limiting principles would be more on what was done, what the information obtained was. And that is to say, if it was captured areas inside the house, if it captured areas that were protected in the backyard or something that were not subject to public view, if it captured information such as it was capable of zooming in to read text messages on a person's phone sitting on their porch, or to read something like temperature or something that a person can't observe, those are all limits that I think Kylo would say exist. But it's worth noting that in Kylo, the Supreme Court suggested that, admittedly in dicta, but suggested it would not be a problem for officers to conduct year round surveillance of a resident's most recent, of course, most recent statement about particularly visual surveillance of a house in order to find out who was inside. They contrasted that with what the court, the government couldn't do, which is have people just break in and find out. But that's not to, again, that's a very long period of time. The government's not suggesting that that would be true, but it's important to note that the court's existing precedent suggests that the limits would be on what would be, what could be reasonably obtained or what could be fairly obtained and not necessarily on the link. Let me ask a less technical question. Wouldn't, wouldn't many of us feel somewhat insecure in our persons if we suddenly found out that a camera was put across the street watching everything we did in the curtilage of our house year round, 24-7? That would make me feel a little insecure. Why wouldn't it make most people feel that way? Well, I would not disagree with Your Honor's suggestion about how a person would feel, but I, it's worth noting that I think I would feel concerned if I discovered that a helicopter was hovering over my house to observe my backyard. And in Sorolla, the Supreme Court found that that would be okay. I think there's, I think many of us would be disconcerted to know, although the Supreme Court has permitted, permitted it, that police are going through our trash or can subpoena our phone records without a warrant. So there's many things that the police are permitted to do that I think we would be doing to us. But that hasn't been the rule. If the Fourth Amendment, if what it's expressly intended to do is to preserve some degree of security in our persons, not make us feel fearful, apprehensive in our persons because of searches, then as new ways of searching and new technologies develop that will trigger those senses, wouldn't, wouldn't it follow that we should not lose the same level of protection that we had before? Well, and I understand that that's a principle the court has often invoked, but I think it's important to realize that that principle of trying to preserve the level of protection that we've had in the past has always been subject to some measure of technological change. And that was the motivation of the reasoning in Cirillo was that because flights by aircraft over houses has become relatively routine, we can't expect the same privacy as we could before human powered flight was possible. Certainly that would come as a surprise to the framers that a helicopter can be over my house, but it's permitted. That was a discrete occurrence. If a drone sat over your house without moving for eight months, you don't think the Supreme Court would treat that differently? Well, I'm not sure whether the Supreme Court would or wouldn't. And I don't and I think that a drone raises different questions because you're talking about something that is not aircraft. But I think they also took pains to note that it was in navigable airspace and where an airplane would be expected to be. But I think I'm not disagreeing with the principle that, you know, the length of time would be of concern on a personal level. But I think what the court's case is, and again, I think Kylo and the Jones majority are perhaps the most clear evidence we have of what the court's thinking is with respect to visual surveillance, is that the court has not expressed a concern based merely on the length of time that it exists. But this relied on the principle that because it's exposed to the public, it's sort of a foundational issue. I think, again, this goes back to Cass's, where Cass has defined privacy as the things that we keep private. Mr. Cummings, raising this use the phrase visual surveillance, which in one sense this is, but the district court at least found, and I'm not quite sure what the government's position on this is, that the particular way the surveillance was conducted was with a digital camera and that that digital camera was therefore searchable in a way that digital information is. We don't know the full extent of the searchability of it. The argument you're making today would seem to apply even if it were true that this was a digital camera with search functions customary for digital information. Are you contesting that it was a digital camera? Well, the information we have is that it was recorded on a digital medium, but the information in this record, and again, this was conducted without a hearing, is that it was searchable only in the sense of being able to go forward and backwards. I'm sorry to cut off your honor. Say that again. It was searchable only in the sense of? Only in the sense that one can, with a YouTube or whatever, go back and forth by moving back and forth through it, but not searchable in a digital sense of, and I know the amicius raised the issue of like facial recognition or some other way of searching. I'm not saying that such a search occurred. In other words, that high tech search functions were used. I'm just asking whether the information was digital information. You're not arguing that it was a VHS recorder. No, no, no, your honor. If that's the question. No, it was not. It was recorded on a digital drive, and what we don't have is any information beyond that in terms of what the functionality was of that and how, if any practical sense, it differed from what this court addressed in Vega-Rodriguez when it said that it wasn't constitutionally significant to record something with a camera and a visual and a simple recorder as opposed to just simply observing it and remembering it. I had one further question just about the costs of a ruling that would be along the lines of the district court's position to the government. You began by saying that there was effectively, I don't know if you meant to say probable cause or at least reasonable suspicion that lay behind the decision to carry out the surveillance that was conducted here. What is the import to the government of being able to do this in the absence of any suspicion at all, which seems to be the rule that you think it's important for us to adopt? Well, it's difficult to know, and I did try to find this out, whether there's been any sort of general survey of the uses of poll cameras and the circumstances in which they're used. I know that they are often used as an early form of surveillance when you don't have an insider and you're looking for a way of corroborating a suspicion that drug dealing or something is happening. When you say that when you're looking for a reason of corroborating a suspicion, I guess I'm just wondering, the rule you're asking us to adopt would be that in the absence of any suspicion at all, you could do this. And I guess I'm just wondering, what is the reason why that's so important for the information that I don't have? I can say only that I think that our view as a matter of law is because we're talking about publicly, publicly exposed activities. There is no need for suspicion because there is a problem. That issue does not, in fact, arise in this case, does it? Because no more than adequate, reasonable suspicion to install the poll camera and indeed the events that it captured over time provided more than reasonable suspicion. It provided probable cause for judicial approval of a GPS a few months later on a car that was being used for drug dealing. It also ultimately provided a basis for issuance of a wiretap, which requires more than mere reasonable suspicion and even more than probable cause because you have to show that other methods don't work. And that wiretap information, which captured the defendants actually talking about drug deals, which were then confirmed by the photographs, which the government intended to introduce from the poll camera. And remember here, the government is only seeking to introduce photographs over a several day time period, which confirm that the defendants met with their drug traffickers in the driveway of the house, just as the information on the wiretap said. So the question that Judge Barron asks is certainly a fair question about the limits of the government's argument, but those questions are not, in fact, raised on the record in this case. And I would agree, Judge Lynch, that's a very... It's raised in the sense that that's the position that the government is advocating. That it should be limitless. I mean, it is raised here because that's the government's position. Otherwise, I go back to the question of, well, what's the limiting principle? Is it at least that there has to be some kind of suspicion of criminal activity? Or are we just going to put these poll cameras in front of everyone's house and monitor and see if there's... If anybody's up to anything? I just have a question. I understood the defendant's argument to be that this was impermissible without a warrant. Yes. Mr. Crum, I think you'd be very unhappy if we issued an opinion that said that the government could do this as long as they have a reasonable suspicion, but not otherwise. Well, I think, again, our view is that the law as it stands permits this without the need for suspicion because it's, again, not subject. But that, as Judge Lynch has very carefully summarized, the information here certainly meets any such standard. And also, as well, can include any such standards for quickly reaching a level of probable cause. In the district court proceedings and in the court of appeal proceedings prior to this en banc hearing, did the government argue, particularly to the district court, that the reason it was permissible against suppression was that there was reasonable suspicion for it? Or did it argue that under Bucci, you didn't need reasonable suspicion, so you didn't have to make any such showing? Well, yes. The argument in the district court was largely focused on whether Bucci was controlling precedent. When you say largely, I just asked you, did the government argue to the district court that it could be, the suppression motion should be denied because there was reasonable suspicion? Or was the only argument you made that you didn't need to have any suspicion? I believe our argument was that we were relying on Bucci and that Carpenter had not altered Bucci's requirement that there not be a requirement of reasonable suspicion. So that's the judgment we're reviewing. Well, I mean, in fairness, I think the court has already agreed with the government's position on that, which is the court has agreed unanimously in the panel decision that Bucci was controlling then, and in fact is now. I mean, what's under review now is whether the court should change that rule. Under review, what's not under review is any argument from the government that because there was reasonable suspicion, the suppression motion should have been denied because that was not raised in the district court again, but we should. Yes. Mr. Crumb, um, the district court went out of its way to Sue a sponte reject a belated argument from the government that, uh, in fact, there was reasonable suspicion here, um, sufficient to support a good faith finding. Um, to my mind, that's highly questionable, but as a practical matter, you did not argue that point in your brief to the on bond court. Have you given it up? We have not, we, we understood the supplemental briefing being to add arguments to what we've made in our initial briefing, it does appear in our opening brief to the court. And we understood this to be a process in which are all arguments we've made. We're still before the courts and just inherent in the idea of supplemental briefing to raise anything new that we thought would be helpful to the court in an on bond proceeding. It's still our view that the good faith argument was properly raised at the time it had to be because good faith is premised on the Davis. Good faith is premised on the idea that there has been an adverse ruling binding adverse ruling, and there has not been at the time. In fact, this says that this court held in the panel decision, but she remains controlling. So there has not been an adverse decision yet, but we raised it at the first opportunity. We understood it to be possible to do in the district court. I would also argue that we think the good faith argument, even if you'd as forfeited would prevail because she's clearly on point and the panel held that it was in fact, not set aside by Carpenter. So even if one views the good faith argument as having been forfeited by failure to raise it as timely as it could have been in the district court, we think we would still, we now do a good faith analysis. Mr. Crumb, our questions have taken us well beyond your time. So let me just ask the court if there are any additional questions of you at this particular time. I have one. Yes. Judge Thompson. And so in, in Bootsy, um, the panel make mention of the fact that, uh, the defendant hadn't shown a reasonable expectation of privacy because they hadn't done anything to protect the viewing of their home to this day. I'm still trying to figure out what that means and what we're supposed to do with that. I mean, we have to put up trees, fences. What does that mean? Well, I, the question about whether one has taken steps to, to demonstrate a reasonable expectation of privacy comes up in a number of cases. And it's part of the showing that a person is supposed to make that they've had a usually a subjective expectation that they've done something to indicate that they intend to keep the particular activity or item private. They're putting it in a box, doing something that shows that it's been a private, I think in this case here, all the court is really saying is that the person did not have such walls or fences and nonetheless chose to take the activities that were subject to, you know, to surveillance. And that is true for, you know, for most of us, it's very rare, even in neighborhoods of, of any income category that people have walls around in front of their yard, but they have private areas, the interior of their house, the backyard, if they have one or other private places. So it's the, it's the choice or the decision to take an act, to perform an activity, do something in an exposed place that, that under cats takes it out of the realm of expectations of privacy, it's not a suggestion that. We need all to, to build something. I don't think that's what Gucci was suggesting, but that there was just, had been no manifestation of intent to undertake the activity in a private place. Follow up. I just have a question, Mr. Crumb, um, in other cases, we have considered it important whether there was a, no trespassing sign put up, whether there was a sort of visitors, you don't know, solicitors, um, that sort of thing. Uh, did you, uh, think that was part of what that, uh, question and Gucci was referring to? Well, yes, in the sense that I think it was getting at the principle that manifesting an expectation of privacy through some means through posting something through, you know, building a fence through, you know, again, going around the side of your house to, uh, to the back, to have a discussion are things that one does to manifest an expectation of privacy within the meaning of. So if I posted a sign that said no trespassing, the cameras is no good. Well, I think the, the, the view of Kyla was that a visual observation is not a trespass. So I'm not sure that would help. It would, it would affect expectations of privacy in terms of entry. I don't think it necessarily would have a, it would alter the analysis here. Um, how tall was the pole? I'm not sure I can answer, answer that off the top of my head. I mean, it was the visual pictures suggest that it was up at the level of a tree, um, and taller than a person, but I can't tell you how many feet up, you know, 20 feet or something like that, um, I could, I'm sure there may be in the records, but I'm not certain to the extent you're honest getting at the point about whether it observes something different than what we're seeing from the street, though, that seems to be agreement that it did not, you know, the license plates and stuff. I'm wondering how high the fence would have had to be. Right. But again, and I think this is just a time for questions. Okay. Anyone else? All right. We'll hear from Ms. Meisner. Thank you, Mr. Crumb. If you would mute your video and audio. And you may proceed when you're ready. Good morning, your honors. Judith Meisner representing the appellee, Nia Moore-Bush. Um, what's at issue here is not the efficacy of cameras as, as crime fighting, uh, tools or whether a pole camera surveillance is helpful to law enforcement, but whether it's used to record every action that's   And the fact that we have a section in the front cartilage of an individual's home, 24 hours a day, seven days a week for eight months is a search under the fourth amendment. And we maintain that indeed it is. If you look at the basic fourth amendment protections and purposes, the right to be secure includes, as the Supreme court has said, a reflection that we have a society that's chosen to dwell in reasonable security and freedom from surveillance. And the analysis of what an expectation of privacy is entitled to protection is informed by what was deemed unreasonable at an unreasonable search and seizure at the time the fourth amendment was adopted. And as Carpenter set out, we, there are basic guideposts that it's seeking to secure the privacies of life against arbitrary power, placing obstacles in the way of a two permeating police surveillance and preserving, and in Kylo, quoting from Kylo, preserving that degree of privacy against the government that existed when the fourth amendment was adopted. So in a way we have to look at societal expectations before technology made it possible to see and record and retrieve everything that somebody does outside their home in their front yard for eight months. And just as the court has held that you don't expect the government to be surveilling the movements of your car for extended periods of time, or tracking you by GPS from your cell phone for extended periods of time. So here there is a reasonable expectation that the government is not going to be surveilling all of the activities at the front of your home and your driveway for an extended period of time. But is any amount of surveillance okay? Because I, I'm sorry, I can't hear you, Judge Thompson. Judge Thompson, we can't hear you. I can hear you now. Oh, I don't know what happened. I didn't, is it still working? Yes. Okay. I said, you, you, you carefully used the word extended surveillance a couple   of times, but is there any amount of surveillance which you feel would be appropriate without a warrant? Or is it your position that any type of surveillance is a, is a search and therefore requires absent exigent circumstances, a warrant? They're not saying any type of surveillance is a search, but I don't think that this court needs to set a, a time limit for, to resolve this case. If any line you draw is going to be arbitrary. And in Carpenter, the court declined to set a cutoff. It said, we don't have to decide how long, how long the period might be. It's sufficient to say that the seven days of CSLI constituted a search. And in the concurrence in Jones, they said they made the same kind of analysis. We don't have to identify with precision when tracking becomes a search. It's enough to say that it's four weeks was, was clearly beyond the pale. And they also noted there that where there's uncertainty, then the police can get a warrant. And so we're saying that here, I'm saying, Miss, Miss Meisner, if I can go back, Judge Thompson asked you a question, which you've declined to answer. And that is, do you consider any surveillance by a poll, poll camera to be a search? Do I, I, I am, I am getting there, Judge Lynch. I'm saying, please answer yes or no. There is poll camera surveillance that could. We'll take the poll camera in this case. In this case, the poll camera surveillance was a search because of its extended length. All right. At what point did, in your view, did it become a search given as I have outlined earlier that it was producing information that was useful to the government that in fact went well beyond reasonable suspicion? Judge Lynch, I don't believe that whether it produced good information for the government is relevant to whether or not its use constituted a search. You could say that one week use might be permissible. Yes. Well, I ask you what, what was the limit and then what are your limiting principles for defining what that limit is? You have just rejected the notion that whether it produces anything is a limit. The period of time, whether it produces anything is analogous to saying that the search is justified by what it produces. No, no, I'm trying to understand what you think the limits are. When does, when does it become a search? I mean, is it always a search or does it become a search at a certain point? I think it would become a search when it goes beyond what a person would expect a character's by to see. So perhaps you can say a day. If the government intends to use it for more than a day, which is generally the case, then they should perhaps go get a warrant. But once you get beyond what the general public would see, then I think it becomes a search. Can I ask you a question about that, Ms. I just want to know under the the rule that you would like to see set in this case, how you would, how it would come out in the following two circumstances. As you know, many law enforcement agencies. So, for example, the United States Marshal Service or the Federal Protective Service install cameras on government buildings that often reveal what's going on in the building. In a circumstance like that, if criminal activity is discovered on those cameras, which were put up by law enforcement, would that have to be suppressed because no warrant was obtained? And just one other question that I've been thinking about, I just want you to help me think about this more. If the United States Marshal Service installs, not at my direction, but as a result of their policy, a camera on the front of my house that reveals what's going on in my neighbor's house as curtilages, same thing. If it ends up discovering evidence of criminal conduct where no warrant was obtained, does that have to be suppressed under the rule that you're asking for? Well, I think part of your questions might depend on whether the cameras on the federal building are in public spaces. And it's I think it's reasonable for people to expect that if you're walking by, you're going to be seen. You're saying that this is that these cameras also take in residences that are nearby? Yes. And in that case, perhaps it depends on whether these cameras are visible to the public so that the person knows that they are on camera. And the same thing with the camera, a security cameras, a security camera, does it have anything to do with whether it's targeted towards an investigative purpose? Should we think about it that way? Well, I mean, a security camera is generally a camera that is put up by a business or an individual to safeguard their property. It's not designed to investigate. Let me change the hypothetical on you just slightly then. So a community police officer doing community policing meets with residents who are having trouble with crime in their area or business owners, and they ask, what can we do to help the police keep us safe? And the police officer says, if you put up security cameras and then when there is an incident, if you will give us that film, we'll be able to uncover the crime. So there's an investigative purpose. It's being done at the direction or request of the police. Does that change your answer at all or does it have any impact on your answer? Well, the use of security tapes of an individual security camera to review, for the security tape is different from the government's use of a poll camera, a targeted poll camera. I mean, as I said, you may expect that when you walk down the street, your neighbor has a security camera and there's going to be a transitory view of what is going on in front of that camera. And that kind of transitory view is qualitatively different from the... The question is about CCTV that some cities are using and that governments are putting up that are monitored by police departments and that aim to deal with the high crime concern within the community, often in conjunction with some of the residents in that neighborhood, and the police, and the police protection agencies do pick up the curtilages of houses in the neighborhoods and they're reviewed 24-7 by police. What is the effect of your position with respect to that? Is it a special needs search and therefore it should be looked at differently? Is the... So you wouldn't necessarily have to have a warrant. You would just assess it for reasonableness. Is the idea that it's not a search... That it's not a search at all because of the way in which it's conducted that's different from targeting a particular person? I'm not following what your position is. Well, to me, a search is something that is undertaken by the government. I mean, that's what... This is. In these circumstances, the government is doing it. In cities right now, there are cameras in cities that are not just picking up public areas in their viewing of the streetscape. They also pick up the curtilages of some residential properties. And if I may add to Judge Barron's question, you may have been reading about the women's marches in England where women are outraged over their inability to walk out in the evening. They are outraged by the death of Sarah Everson, by the brutality of the police in dealing with the marches after the murder of Sarah Everson. And one of their demands is that there be more CCTV cameras put on the streets to ensure their safety. Well, the Fourth Amendment in this country is designed to provide individuals with security against government intrusion and invasion of privacy. Sarah Everson was murdered, or at least the accused is a police officer. This is intended to pick up government misconduct as well as private misconduct. Yes, but the cameras that we are talking about in this case were not designed to guard against government misconduct, but were targeted at specific individuals who the government was investigating for criminal activity. I think that the CCTV cameras are an issue that need not be resolved in this case, even because the issue here is not whether cameras that take in a broad swath of a community for purposes other than investigating a particular individual would require a warrant, but simply whether a poll camera directed at an individual's home for purposes of criminal investigation require a warrant. So, the court needs to- If you had to give us the narrowest holding that we could make in this case, how would you express it in a sentence? We hold that what? We hold that the warrantless use of a poll camera to record 24 hours a day, seven days a week for eight months, all activities occurring within the cartilage of a home constitutes a Fourth Amendment search. Ms. Meisner, you started on that point, but factually that is not what happened. The poll camera could not record in the darkness. The poll camera could not record through the leaves of the tree when it was in full bloom, and I believe, as the government lawyer said, there was agreement that the camera could to someone on the street. So, can you then narrow your proposed holding? Well, the camera did record 24-7 what was going on. The visibility, what you saw, may have differed in terms of whether it was night or day. Are you saying that it could actually see something in the darkness that people could not see? There are night photos in the appendix that show that the camera was picking up. Yes, that people on the street could not have seen, given the light conditions. I don't believe that argument has been made. No, I'm not arguing, Judge Lynch, that someone passing by could not see. What about the nosy neighbor across the street who's quite interested in what she considers to be possible drug activity in the yard and driveway of the house of her neighbor? Again, the nosy neighbor is not going to be recording 24-7 for eight months. And the recording gives the government an ability to engage in a retrospective analysis to go back and see things that the individual observing at a particular moment might not have deemed significant. But with additional information, there are things that become significant. And an individual who's watching something is focused on what they are viewing. There may be other things going on in the same area that you are not focused on and therefore are not processing that reviewing these tapes at a later date will reveal. Well, Ms. Meisner, the issues in this case and the questions that we've asked have done to you what they did to Mr. Cromm. So let me at this point ask the court if they have any other questions of you for now. Seeing none, thank you. If you would mute your audio and video, we'll hear from Ms. Thompson. Can you see me? We're still waiting. Give it a second. If you start talking, you'll pop up. Okay. Thank you. Linda Thompson representing Daphne Moore, an appellee in this case. When the motion was filed in the district court before Judge Young, the claim was that this was a warrantless search. That put the onus on the government to justify its activity. At that stage in the district court, the government did not claim that it was acting on reasonable suspicion. And in fact, when Judge Young said, when after you put the camera up, did you actually get something you intend to use that is helpful? The government was unable to answer that question. They were planning to look back at all of the footage they had and decide what they wanted to use. But the defendant in that case, Ms. Moore, said, we believe that they did not get anything they wanted to use until November. And this camera went up in May. So in May, from May, June, July, August, September, October, nothing that they observed was, in their view, worthy of presentation in a criminal case. Ms. Thompson, I beg your pardon. You just stated the defendant's position on it, correct? You are not stating the government's position on it. On what? Whether anything was turned up that was useful in any sense. It is true that the government sought later to introduce limited images from the poll camera that were in late November and December. But as to the other question, the government said it was not prepared to answer the inquiry at that point. Are you denying that there was a GPS tracker put on the car? Are you denying that a warrant was issued for wiretap evidence later? Of course I'm not denying those things. Okay. All right. Now that we've clarified this, would you like to continue in your argument? Yes. Could you just, could you clarify one point on that? Is there anything in the record that shows whether any of the pre-November images from the poll camera were used in support of the application for the GPS tracker or the, I don't know, was an application obtained for the GPS tracker? It wasn't on Ms. Moore's car. Well, do you, I guess. Whose car was it on? I'm not certain whose car it was on. Do we have anything in the record that suggests whether any of the pre-November images were used to obtain either the authority to use the GPS tracker of authority was sought or for the wiretap? I know that the, I learned of the poll camera's existence from the wiretap application. Okay. All right. That's how I learned. Is that application in the record? I believe that it is in the record. There was a lot of impounded material that's been provided to the court and to the district court. So the government in this case, we argued this in the district court. Wait, wait, wait, wait, wait. I don't understand what point has been clarified. Was there a concession by the government that the images captured before November were not useful? I'm, Justice Thomas, Judge Thomas Thompson, I'm talking about what happened at the evidentiary, at the non-evidentiary argument. Right. And I'm trying to figure out what happened. What happened was Judge Young asked the government what they planned to use from the camera, and they were unable to say what they wanted to use. At trial. At trial. Correct. All right. Thank you. So, yeah, all I'm saying is that the government was unable to inform Judge Young what they intended to use from the poll camera. I would like to point out to the court, as I noticed that it's Justice Harlan's concurrence in Katz that is at issue in many of the questions here, that one of the things that Judge the limitations on Fourth Amendment protection were impaired by the Goldman decision and therefore they overruled it because of the fact that reasonable expectations of privacy could be defeated by electronic as well as physical invasion. And that this was a law that they intended would be developed over time. And I think that one of the things that's clear in this case is that early on in 1997 in Vega Rodriguez versus Puerto Rico Telephone Company, Judge Selya differentiated between untargeted known surveillance and surreptitious surveillance. And in that decision, he said, concealed cameras which infringe upon the rights of criminal defendants raise troubling constitutional concerns, concerns not implicated by an employer's actions in this case, which was a disclosed video surveillance in an open area. So there are several things at issue here. One is this is surreptitious and it's recorded and it's what the government is doing. So all of the focus, it seems to me, of the questions that have been asked have been on what the defendants were doing in their cartilage and not on what the government was doing with its search capabilities. The recording is one of the things that was at issue in Carpenter. It was the aggregation of personal information over a long period of time that was different than a single observation by a passerby or a nosy neighbor. So one of the things that the court was concerned with in Carpenter that shows up when you read the they weren't doing the surveillance. The government was not doing the questionable surveillance. They were merely accessing the surveillance that someone else had done. And that fell within the third party exception. So we now have at least three exceptions to standard, three caveats to standard exceptions to the warrant requirement, which are characterized by Riley, Collins v. Virginia, and Carpenter. And so this is time, I believe, for us to say that walking out of your house is not purposeful exposure of what you do. Your cartilage in this day and age is your front yard, is your porch, is your driveway, and there's no way to live in society without going out of your house. Certainly the response to the curtailment of travel and physical activity during the pandemic has demonstrated how much people expect to be able to go out into society and be in public without forfeiting their rights to privacy. The court in Kilo said everything that happens in the house is intimate. And while it is true that you could station someone outside that house 24-7 to watch it, that would not be surreptitious, and people could adjust their expectations accordingly. But when you have the ability to record every movement that a person who owns a house makes in and out of their house, every person who comes to visit, you are determining what is happening in the house, who is in the house. In fact, in our brief and in the appendix, we've demonstrated that that's exactly what the government did. They interrogated Ms. Moore about who was in her house, when she was in her house, when she was not in her house, who was there when she was not there. So if that doesn't tell you what is going on in the house, more than whether or not a light was left on in a closet, as in Kilo. Attorney Johnson, your position, if I'm understanding it correctly, seems to be a little bit more definitive than Attorney Meisner's. Is it your position that no amount of surveillance with a poll camera would be permissible without a search warrant? No amount of, yes. I just don't see how you can sort of say, well, a little bit of eavesdropping is okay, but not a lot. So I believe that the combination of the poll camera, its hidden nature, and its ability to record, which gives the government an opportunity to do something it cannot really do with a person conducting surveillance in front of the house or on the side of the house. Ms. Thompson, you also said just a few moments ago that posting a police officer to keep an eye on the house is not surreptitious, with the implication being that that would be okay under the law. So what about the police officer who is in hiding, surveilling the home? I take it you would say that's not okay, because it is surreptitious. It depends. You know, all I can say is that I have not seen a Supreme Court case that says a police officer cannot walk down the street and look at a house. So what about my question? And if they're hiding in my yard, that's going to be a trespass on my privacy. That was not the question, of course. Well, I don't know where they would hide in my neighborhood or in the average... Well, counsel, come on now. Assume they can hide somewhere. All right. Not in your neighborhood. Assume they can hide somewhere, and you can even throw and assume they're hiding with a camera in their hand. Okay. Is that okay? They're somewhere in the street hiding. Is that okay? So far from this, I would say that probably that would pass muster for one time. I don't think they could camp out for eight months or a week with a camera and do that. What about without a camera for a month? I don't think they can do that either. I mean, one of the things that Carpenter and other cases suggest is that this is not the kind of thing that the government is going to do. They are not going to post a person outside of your house. Just so I understand, I thought you were focused on the recording. So that would suggest to me, if that's important to you, that the officer hiding in the bushes for four months, which I recognize has its own plausibilities, but granting that there were some circumstances, maybe they happen to own a government office building across the way, so they could easily inhabit it for four months and look out the window and see what was going on. But they didn't record it with a digital camera. I see why you might say that's still covered. But if your focus is on the recording capacity, which allows you to retrospectively go back and see in perfect form everything that had happened prior to that, that would seem a rather different type of surveillance. I do think that's a very different type of surveillance. I think the recording and the fact that it's surreptitious and the fact that you can go back and I think one of the things in Carpenter that was suggested was that you cannot today say, I'm going to get a search warrant for what happened a month ago. But you can't find that out. Ms. Thompson, just to follow up on Judge Barron's question, you seem to say each of the fact that it was hidden surveillance and independently the fact that it was recorded, each of those independent steps meant that a warrant was required as opposed to the cumulative effect of all of this. I'm just unclear about what your position is. Well, my position, I don't understand how they would be independent from each other. My understanding is as soon as the camera went up, it started to record at a remote location where it could be monitored live or it could simply you could go there, look back and see what happened during the day. Okay. So as to the recording of it, is it the fact that it's the type of continuous recording that you can play back but not otherwise search? Is that what is important to your argument? My understanding in this case, Judge Lynch, is that this was searchable. This recording was searchable. The government has asserted that, not quite clear what you mean by the term, the government has asserted that is not the case. All they could do was play it back and look at it. I don't think that's a finding that Judge Young made. I thought... No, Judge Young didn't actually have an evidence hearing about the capacity of any of this. He seems to have relied on arguments that were made. In any event, sorry to have interrupted you. Do you have another point? Yes, I do. Judge Young did ask the government whether they thought an evidentiary hearing was necessary. The government is the party that eschewed an evidentiary hearing, not the defendant. Didn't they say under Bucci, we don't think it's necessary? No, they said that they could basically tell the judge what the factual capabilities were of the camera. That's what they said. That's what Judge Young relied on. Thank you, Ms. Thompson. Let me ask the court if there are additional questions. Judge Barron? I had one question. Could you just address the good faith issue? Even if everything you said today is persuasive, there's still the issue in light of Bucci, whether the proper conclusion is to reverse the district court. Deny the suppression motion. I think that when a motion to suppress is filed, that puts an onus on the government to put forward its best case. At no point during the argument, which is included in our appendix, did the government say that their officers relied on Bucci in putting up this camera, this poll camera. They never suggested that that was why the poll camera went up without a warrant. But that would mean, okay, forfeiture. So we're on plain error review. Well, plain error review, I haven't even seen the review of Judge Young's. I mean, for example, Judge Young made a finding that this was not a security camera, and yet. Judge Thompson, maybe just like, are you saying that in order to be able to invoke the good faith defense under Davis, there has to be a finding that subjectively the officers relied on the law that would support the decision? I think there has to be some suggestion to the court prior to its ruling that you were relying on the case. And your position is there's nothing in the record that indicates that these officers were aware Bucci, relied on Bucci, would have done anything differently if Bucci hadn't been in there. And you say Davis suggests there has to be something in the record showing that. I just think that for the purposes of a motion to suppress in the district court, the party's positions should be made clear. And if it was made clear to Judge Young that this kind of surveillance was conducted in reliance on Bucci, that he would have addressed that. And it was not made, and he said so. Well, you wouldn't want us to apply that rather robust version of waiver doctrine to criminal defendants, would you? We get cases and cases every month where a criminal defendant is silent, doesn't raise a point below at all. And the normal rule is that is a forfeiture resulting in plain error, not waiver. Well, I understand that. I did read some of the argument in Collins and in Carpenter, which were both decided in the same term. And one of the laments that Justice Gorsuch made was that those two cases, that Byrd and Byrd, were both decided by those people, and they decided it anyway. I'm just going to ask one last time a question I'm not sure I'm getting an answer to. Let's say we're on plain error on the good faith defense, and let's say the sole basis for the good faith defense is the fact that Bucci was in place at the time of the use of the poll camera. Are you saying that in order for the government to be able to show plain error, there needs to be something in the record indicating that the government relied on Bucci, and it's not enough for us to just note the fact that Bucci was in place? That would be my position. Judge Howard, can we take a recess? Yes. Thank you, Ms. Thompson. If you would mute your audio and video, and before we hear from Mr. Freed-Wessler, we are going to take a three-minute recess. Thank you. At this time, we're returning on the record. U.S. v. Moore Bush and U.S. v. Moore. Case numbers 191582, 191583, 191625, and 191626. Attorney Freed-Wessler, please unmute your device at this time and introduce yourself from the court to proceed. Thank you. Good morning, Your Honors. Nathan Freed-Wessler on behalf of Amici ACLU et al. I'd like to begin with a couple observations about how the government's positions interact with law of the Supreme Court, and then address some of this court's questions from the earlier colleges. As I understand it, the government's position here is twofold. On the one hand, the government argues that people need to erect a fence around their property to manifest a subjective expectation of privacy against prolonged poll camera surveillance. Even though zoning regulations often forbid it, including the zoning regulations that we cite in our brief applicable to this very property in Springfield, which absolutely forbids erection of any fence whatsoever between the front foundation line and the street. On the other hand, the government also argues that the 1980s aerial surveillance cases control, and in those cases, it did not matter what steps a person took to protect their privacy from observation. Not a 10-foot fence in Sorrello, not covering 90% of the greenhouse roof in Florida v. Riley. But those cases do not reach this far in this case. That is because for one, those involved short-term fleeting observation, quite unlike the eight months of uninterrupted observation by technology and recording at issue here. And it involves observation from a place where the court in both Sorrello and Riley made clear that members of the public routinely pass, which certainly cannot be said of the top of the utility pole. And indeed, just one year after the Supreme Court decided Sorrello, the Fifth Circuit in Cuevas-Sanchez distinguished Sorrello in holding that longer-term pole camera surveillance of a home is a search requiring a warrant. All right. In this case, how short is short enough? So, Your Honor, I think just preliminarily, I agree with Ms. Meisner that consistent with how the Supreme Court decided Carpenter and the five concurrent justices decided Jones, this court need not draw the line. It's sufficient to say and explain why eight months of uninterrupted pole camera surveillance is a search. I think that if the court wishes to draw a line or a principle, it should be tied to what people's expectation is based on the practical abilities of police and any member of the public. People expect and understand that their activities in public, including the curtilage of their home, may be observed in bits and pieces. Nobody expects the whole of those movements over a long period to be seen and recorded. Now, whether the... Now, Mr. Westler, do you think people have an expectation of privacy in pulling rental cars into their driveway in full view of everybody, which are used for drug transactions? This occurred a number of times, including a time that was a confirmation of a wiretap that said that this was going to happen. What reasonable expectation of privacy do people have in conducting criminal activity in the driveways of their homes? Your Honor, people certainly understand that a passerby, including a police officer, may observe their activities in discreet manner. Okay, let's take the nosy neighbor who's across the street and is concerned about crime in her neighborhood. A nosy neighbor may watch for a period of time, maybe even a bunch of time. What a nosy neighbor... What a poll camera doesn't need to do, though, is to sleep, to go to the bathroom, to answer the phone, to take a break, to look away. Mr. Westler, Mr. Freed-Westler, I'm having trouble with this whole concept. There are lots and lots of neighborhoods where there are houses directly across the street, and there are security cameras in the front door. It's becoming much more prevalent than ever before. So I do not understand the point that people don't expect to be on camera 24 hours a day when they come out of the front of their house. People do expect that. Am I wrong? I don't think people expect for the full measure of their activities in the courtyards of their home to be recorded over a long period of time. That wasn't your point. Well, Your Honor, I... So, two responses. One is that I think they're, to that hypothetical, to that situation, and to some of the... No, I'm trying to frame it the way you did, the practical realities of living today in today's society, not hypothetical. So I do think, Your Honor, that if law enforcement went to the house across the street and asked for footage that happened to include someone's activity across the street, I think that would likely be a different case on a variety of grounds. One, potentially, would be the duration of the recording. Those systems, as I understand it, don't record eight months in perpetuity and hold it forever. There's a measure of over-recording to save... So if the security camera is put in my house at the insistence of the U.S. Marshals Service, does that change the formula for whether it should be suppressed or not? I think if it's put in your house for a criminal investigative purpose in order to watch a neighboring house, then I think that's equivalent here. That is state action, if it's sufficiently long-term and captures... Okay, so if it's not specifically put there in order to watch the neighboring house... This is good. I see you sort of heading toward Ms. Meisner... I think it was Ms. Meisner's point that it depends on whether the person is being targeted or not. Is that your view? I think it may well. As I believe Judge Barron suggested, the special needs exception may come into play. I think there are a wide variety of circumstances where... I'm sorry, what level of targeting is necessary? I suppose in the run-up to January 6th, the federal judiciary received concerning messages on the internet and therefore wanted heightened security at the homes of all federal judges. They put on not a repeating loop, but a non-repeating loop. They had no idea where any threat would come from, but wanted to do the job the Marshall Service has been tasked to do, which is protect federal judges. Your Honor, I think that each situation may differ in particulars, but I think in general, the purpose is... I'm sorry. Okay, so you want to say, well, that may be okay, but the fact that the Springfield Police have reasonable suspicion and therefore they put up a pole camera, they have reasonable suspicion from confidential informants that there is both illegal gun sales and illegal drug transactions taking place at this home, that is not permissible? Your Honor, so to finish answering your predecessor question and then to address what you just said, if I may, I think that perhaps there will be situations where it is permissible to record over a long period for a non-criminal investigative purpose. Now, there may be a limitation to get a warrant if law enforcement wants to then query that in a specific investigation, and that was really what Carpenter was about. Now, once we are talking again about this case, this is a classic law enforcement investigative search, not covered by the special needs exception, and the Supreme Court has made clear a couple of... I'm sorry. The attorney is arguing the position you're expounding upon. Talk about the limitations on the ability of police, limited resources, and therefore they're not going to put someone out on the street for eight months. Those same limitations apply to pole cameras. They don't put up pole cameras for no reason whatsoever. Here, they have very good reasons to do so, and as Judge Howard said, we're, at least in the neighborhoods where I live in the city of Boston, surveillance cameras are ubiquitous. So what is the limited principle you are trying to advance, which does not get us into all of these conundrums? Your Honor, what we are concerned about here is the covert, targeted, and surreptitious long-term recording of people's activities in the criminal... Does it make any difference to you at all that that recording was quite productive? No, Your Honor, not at all. I think the Supreme Court has made absolutely clear in a number of Fourth Amendment cases that expectations of privacy are not set by what the government turned up, whether it was useful or not. And in fact, and this goes to, I think, a question that Judge Barron asked earlier, Carpenter is a good example. In Carpenter, the government obtained two tranches of location history, four months' worth and seven days' worth. It only used 16 individual location points at trial from a few scattered days of robberies. What the Supreme Court focused on was not those 16 points that might end up being suppressed. That's a remedy question. The Supreme Court focused on the nearly 13,000 individual location points spanning four months that revealed privacies of life. In Carpenter, the Supreme Court... Everywhere people had been. And this case does not involve any such tracking. Soon as the people who live in that house leave the area, surveilled by the poll camera or by the neighbor or by the police officer undercover on the street and not obvious, that's the end. It is not like the Carpenter case. Respectfully, I disagree, Your Honor. Obviously, there are factual differences. I'm not saying that there aren't. But the reason long-term location information obtained by an all-seeing, unfailing technology is sensitive is it reveals patterns of life and associations that lay bare privacies of life. So choose here. A long-term record of activities at the threshold of the home reveals when we spend the night at home and when not, who we spend the night with, which visitors we invite inside or for a socially distanced conversation on the porch, what items we carry with us when we come and go and what time we do that, what packages are delivered, and so much more. It's a similar intrusion. And as the Supreme Court explained in Carpenter, this kind of intrusion opens an intimate window into a person's life, revealing familial, political, professional, religious, and sexual associations. Mr. Friedweiser, there's lots of mention of the recording. When do you maintain the search occurred here? Was it when the recording was made or was it when someone looked at it? And I imagine a circumstance, suppose the camera viewed everything but recorded nothing for more than a second, so there was nothing for anyone to access. Would that be a search? Thank you, Your Honor. So I think that the search in this case happened at the time of the recording, as the recording captured a long-term picture of activities. I also, though, think that the recording and storage indefinitely of that eight-month period is a relevant part of the intrusion, and it's part of the intrusion this court must consider. Now, I think that there are other types of camera surveillance where only the access, of the data, might be a search. For example, cameras erected for other purposes, traffic cameras, cameras erected by private individuals in their own home, cameras run by third parties, like the third-party collection in Carpenter. There might be a situation where collection is fine, but access requires a warrant if the request is for a long period. That's not implicated here. Here it is the long-term recording. Now, if it was a camera that deleted after one second of storage, I think that's a much closer case. I do think that it's relevant that there are police officers able to sit comfortably in a downtown police station without any chance of detection and without any of the practical limits that attend attempts to stay secreted in the real world to watch. So I still think that would affect expectations of privacy, but I think that's not this case also. Hi, I'm sorry. There sounds to be like some kind of a... So it may be someone's headphones. I will ask the judges that might have headphones if you could just unplug them from your PC for a minute. And then if you can plug them back in. Can everyone hear us now? Yes. Okay, that must have been it. So I'm sorry, Judge, for intruding. I'll let you go ahead. That's all right, Mr. Preet Wessler. You should proceed unless a judge has a question right now. I had a question. I need to know in one sentence what you want our holding to be. I think my answer is very close to Ms. Meisner's answer, that long-term surveillance of the camera is a search that requires a warrant. I think this court need not define what the temporal line might be between surveillance so short term that it actually comports with people's practical expectations that passersby or police might observe them for a short period, but that protects against this situation, which implicates the very core of the series of Supreme Court cases about government use of technology to expand government power and shrink privacy. Judge Kayada, as you remarked earlier, the touchstone of those cases is the Supreme Court's observation that in the face of advancing police technologies, the Fourth Amendment is intended to assure preservation of that degree of privacy against government that existed when the Fourth Amendment was adopted. Of course, we expect police might, like any member of the public, be able to watch us for some period of time, in the rare case, maybe a significant period of time. But the fact that sometimes that might happen in the physical world is just a fundamentally different intrusion than the capability here, which every time it is deployed, creates a perfect, unfailing, long-term record of somebody's privacies of life in the cartilage of their home. Are there additional questions, Judge Barron? Judge Howard, I just wanted to follow up on the question that you've been asking, which is, do you think that, rather than criminal investigation, in ways that may incidentally—incidentally in the sense that, in order to serve their non-directed criminal investigatory function, they will pick up, incident to whatever the security need is for the camera, the cartilage of a neighboring house, not just for a moment, but for some substantial duration, and that would record that streetscape and, therefore, the cartilage of that house? And if there were a warrant requirement imposed in that circumstance, the consequence of the use of cameras for those purposes? Because, obviously, you couldn't get a warrant, it would seem, for that, unless, I suppose, there was some conclusion. I mean, I suppose you could say you need to get a warrant for probable cause of a security related. And I don't hear you to be saying you want us to decide, in this case, that a warrant is required in those cases. So I'm trying to understand what the theory would be in which you could make that distinction. Are you able to hear me? Yes, I am. Thank you, Judge Barron. So if I could, I have an answer to that. If I could just start by describing what I think are the relevant features of this surveillance and then contrast them with, I think, a number of factors that may, in various situations, provide a grounds for distinction. I want you to, as you do that, I want you to not only identify the factual distinctions, but legally there seems to be at least two different routes by which one can come to that conclusion. One is that somehow this is a search and that's not a search. And the other is both are searches, but the justifications for the latter type, the CCTV type of search, or security related search, are distinct from the obligations law enforcement is subjected to when they're doing a search of this kind. I am pretty comfortable understanding, if you'd like to address it, you're fine, how we might distinguish it if we conclude that both are searches. But what is less clear to me, is there a ground for concluding that one is a search and the other is not a search? And how could one reach that conclusion under Carpenter? Thank you, Your Honor. So let me try to start there and just say preliminarily, I, again, do think that there will be a number of situations where the special needs exception may come in, even if both are a search. But I think there are going to be a number of those deployments of camera technology that may not even be searches. And I think the easiest factual grounds that I think will arise quite often with those types of public facing surveillance cameras is the length of the duration of recording. So the purpose of most of those cameras, as I understand them, is to deter crime and to in a relatively short amount of time, go and preserve the footage before it's overwritten, which it typically is on some time frame. And I think it differs. And so what you don't have there is this pervasive recording of somebody's every activity over time. Now, in a situation where you did have pervasive recording for a law enforcement purpose that happened to capture the privacies of life, the privilege of somebody over a long period, I think, as I suggested earlier, a rule that governs that requires a warrant for a request for a certain duration of that footage, essentially in the nature of the carpenter rule might address the question. But I don't think there's any situation under our theory that would require a warrant somehow for police to put up public facing security cameras for other purposes. And again, I think, depending on the fact, they may not even be searches under our understanding of the Fourth Amendment. So if I'm following you, the person whose activities are caught on the camera has a different reasonable expectation of privacy, or are you saying that is not the measure of it? I think every person who lives in a home has the same expectation of privacy that the government will not use this kind of technology to create a perfect record of their activities at the threshold of that home over a long period. What I think... Okay. Of course, the Supreme Court has said quite the opposite over a large number of years and a number of doctrines. Other than the Carpenter case, do you have any other case that supports your position? Absolutely, Your Honor. Carpenter adopts the five concurring justices' opinions in Jones, which I think speak very closely to the situation we have here. And the government in that case, I'll say, made very similar arguments to what the government has argued here. I'm just asking you to list the opinions. Yes, Your Honor. So I think we also have, in almost all, perhaps all of the cases in the Supreme Court addressing observation of activities in public, the court carves out questions raised here about longer term surveillance. So in Knotts, the court said that relatively short term tailing of a person using a beeper over one car trip, not a search, but a situation involving 24 hours surveillance using technology might be different. In Sorallo and Riley, the court explained that these one time or several time pass over flights comported with people's expectation that planes and navigable airspace might see them, but carved out more difficult questions of long term surveillance. And particularly, I would commend the court to Justice O'Connor's concurrent opinion in Riley, which was necessary to reach the holding there. There was a four member plurality and Justice O'Connor wrote separately, where she explained that a helicopter that circled over a long period of time over that home, observing more than someone would expect. Okay, I have another question. Judge Scalia, in one of his well written opinions, said that at the time of the framing, it was well understood in English law that that which people put on public display was not subject to the Fourth Amendment reasonableness requirements. So while you've given us your spin on these Supreme Court cases, what is your response to the Scalia opinion that says the principle underlying our circuit law in Bucci was in fact embodied in the Constitution at the time of the framing? Your Honor, I think it remains very true that if a person is in a visibly public space, they should fully expect that somebody or many somebodies may see them for discrete periods. What the Supreme Court though has said in a series of cases involving evolving technologies available to police is that courts are not to mechanically apply older Fourth Amendment doctrines to new technological realities. But how is this a new reality? Poll cameras have been around for a very long time and have been approved by the Supreme Court and every single circuit. This is not third party gathering of information that people wouldn't ordinarily be able to access or view. The government makes an argument in its brief that, yes, all of those cautions are true, but they do not apply to the old technology of poll cameras. Thank you, Your Honor. So if I could respond to two points Your Honor made. First, Carpenter described the visual surveillance cases, the public exposure cases, as third party cases. There are two lines of doctrine there. The third party doctrine, business records and the like, and the so-called public exposure cases, which is described as third party cases. And I think that is very much the territory we're in here. So the Supreme Court has addressed this general situation. To your more specific point, the court in Carpenter and the five concurring justices in Jones made very clear that the relevant comparator to assess traditional law enforcement capabilities is not to look at how many years or decades an earlier version of this technology is available, rather to look at police capabilities based on practical limits of resources, of time, of stealthiness before the advent of that technology. That's why in Jones, the court compared against police's ability to follow or tail a person for some amount of time before being discovered, didn't look to the fact that police had had access to GPS transceivers for years at that point. In Carpenter, the court looked to the ability of investigators to piece together some number of discrete moments in the past based on interviewing suspects, looking at documentary evidence and the like. The court wasn't detained by the fact that cell phones at that point had been in wide circulation for at least three decades. Here, police, of course, can do what any member of the public can do. They can pass by a house. They can try to park outside. They can watch for as long as they're able. But that will always be limited on the whole by practical difficulties in maintaining long term surveillance. OK, as I hear your argument, you're saying all of those poll camera cases were wrongly decided because every single point you have made is also true of all of those long standing poll camera cases. Is that correct? That is your position. OK, it is overruled. OK, let me just interrupt and ask if there are additional questions from the court. Seeing none, we thank you, Mr. Freed-Wessler. And we will hear from Mr. Crum again if I see that you're muting. That's wonderful. Thank you. Hi, your honor. I'm sure you may have questions. There's a couple of things I wanted to address right off the bat. One is the last point, and I think it's important to clarify because it's not correct that public exposure and third party are the same doctrine. In fact, they operate quite differently. Public exposure goes to the very heart of the CATS test. It stands in CATS itself as the origin, the dividing line between that which is publicly exposed and exposed means simply not covered or hidden is the definition in dictionaries versus that which is intended to be or shown to be private. And that existed from the start. The third party doctrine exists in only two cases. And those were the cases that were addressed in Carpenter. That's not to say that there isn't an overlap. But one is the foundational definition as to what is private. And one goes to a particular exception carved out by the Supreme Court with respect to documents turned over to third parties under an assumption of the risk analysis. So those are very different things. And I don't want to, I think it's important to keep them separate because we've been getting the Carpenter because it's a third party case is not about the central issue here, which is expectations of privacy at their outset. Can I ask you about that, Mr. Cohn, because it's pretty clear for me from the text of Carpenter that although it addressed the scope of the third party exception, it separately addressed the reasonable expectation of privacy through the public exposure cases. Well, my understanding, my reading and justice, I'm sorry, there's a whole section on that in Carpenter. So I just don't follow that point. Well, no, no. The point is not that it doesn't talk about the public exposure, but the point is that what the case was deciding was the applicability of the third party doctrine. And justice, I think justice Kennedy's. I just asked you this last week because you say this in your brief too. So maybe it would be helpful to clarify for me. In Carpenter, they say this case stands at the intersection of two lines of cases, the public exposure cases and third party doctrine cases. It then first goes through the public exposure question as to whether you can have a reasonable expectation of privacy in the whole of your movements. And it concludes that you can, but that it would be contravened by accessing this information. It then addresses whether the third party doctrine means that nonetheless, you can do it. That's how I read it. If that's right, you then seem to say, well, OK, all that's true, but they are what they were talking about was the accessing of the cell site records. We're here. We're just accessing things that you could visibly observe. Am I right in understanding that distinction? Right. I mean, and I think that's the distinction, again, you're on an earlier session that I brought from Jones. Yeah. And my question about that distinction is why is that the right comparison? I would have thought the right comparison would be the cell site information on the one hand and the digitized recorded information on the other. That would be the symmetrical, the symmetrical analogy. Well, and that's. Digital information is like the digital information in this case is like the digital information in Carpenter. Answer might be yes and might be no, but that seems to be what we have to decide. Well, that's exactly the question I wanted to go to, which I think that's the critical difference is that how the knowing exposure idea plays out, because what was Carpenter was about was, yes, this is the public existence of a person's location is a visible fact. But what we're talking about is an electronic collection of information that does not turn on the visible observation of it, but turns on something a person doesn't know is happening. That is, a person doesn't know their cell phone is communicating and creating this record, just like the GPS holder in Jones does not know because it's deliberately been put on surreptitiously that they're emitting information that's creating an electronic record. So the concept, that's why we keep turning back to cats. The concept of voluntary exposure or knowing exposure is completely different. If I'm walking around, people can see me. But if I also have my phone, I don't. And I'm exposing my presence to anybody who might, but I'm not exposing the fact that my cell phone is communicating with a third party to the government. I don't know that that's happening. And if they happen to place a GPS on me, I'm not knowingly exposing that GPS information because I don't know what's happening. So that's why the idea of knowing exposure is so critical. And that's why, how I make sense of the Jones majority's distinction in responding to Justice Alito's concurrence that four weeks of GPS monitoring that the person doesn't know about could be a problem, but four weeks of physical watching of them using technology, planes and cars would be permissible under this court's precedent, Justice Scalia says, which suggests that, again, there's a difference between the thing you are actually exposing, your public visible activities, and the thing that you don't know is happening. Say, again, a type of monitoring that I don't know exists, is being emitted by my electronics. And I think that is also important when we're talking about like the question Your Honor has been pressing on, which I think is important, that if this is visual information like the kind that Kylo said would be okay, that Jones would say would be okay, then the real significance is the issue of recording. The significance of the recording aspect. In Vega-Rodriguez, this court suggested that the mere fact of recording something that is otherwise watchable, and therefore having a more permanent record, is not constitutionally significant. That's what that court said. And here it's important to note, the defendant Moore has a laundry list of cases in which people talk about how disconcerting visual surveillance might be. With one exception, those all take interiors, hotel rooms. In one case, in a locker room of a high school. So these are cases in which the question of expectation of privacy wasn't raised, and the question was the intrusiveness of the government. In many cases, they had a warrant for it, use of video surveillance. The only case to the contrary is Anderson-Bagshaw, and that was a case where the court didn't reach the issue. It was a backyard. It was protected in the observation to a poll camera. We don't know of any case, and this goes to what Judge Lynch says, we're not aware of any case in which surveillance of this kind, permissible, assume arguendo as to the officer standing there, becomes impermissible merely because it's recorded. All the poll camera cases of the front of the house, including several appellate cases, and dozens at this point, with a couple of small exceptions, district court cases, have agreed that that act of recording does not render otherwise public information private or create a problem under the Fourth Amendment. The one other point, I guess just briefly I want to add, I know I'm probably over my time already, is just to address quickly the question of limits and technology. There's been some talk about CCTV cameras and the proliferation and the numbers of them and what that may mean for expectations of privacy, but I also wouldn't want it to suggest or appear to acquiesce in the idea that there's been a similar proliferation of poll cameras. Poll cameras remain something that are used for investigative specific reasons. They are, as the camera here shows, resource intensive to use. You have to put it up there. You have to have it, in this case, you had to monitor it in order to use the zooming function that made it very useful. Obviously, in the same way that police can't stake out every neighborhood in police cars, they can't run these kinds of operations, except in cases where they feel they need to. While there may be a time that comes when they become so readily deployable and so inexpensive that they are used in that way, that's not the case here. There's no suggestion that that's how they're being utilized. I think that's important when we're looking at the idea that, in many cases, the practical limits are the real and important limits to the concerns that people have about them being overused. Additional questions? If not, thank you, Mr. Crom. I'd like to thank all counsel for their time and their arguments today, and we will get a decision to you. Thank you. That concludes the arguments for today. This session of the Honorable United States Court of Appeals is now recessed until the next session of the court, God Save the United States of America and This Honorable Court. Counsel, you may disconnect from the meeting.